

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00299-CV

**IN THE INTEREST OF J.J.B.**, a Child

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-PA-02385
Honorable Martha B. Tanner, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:        Sandee Bryan Marion, Justice
                Rebeca C. Martinez, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed:  August 27, 2014

AFFIRMED

James B. appeals the trial court's order terminating his parental rights to the child J.J.B.,[1] arguing the evidence is legally and factually insufficient to support the trial court's findings in support of the order. We affirm the trial court's order.

A trial court may terminate the parent-child relationship only if it finds by clear and convincing evidence one of the statutory grounds for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1), (2) (West 2014). Here, after a trial to the bench, the court found that James knowingly placed or knowingly allowed J.J.B. to remain in conditions or surroundings that endangered the child's physical or emotional well-being, that

---

[1] To protect the identity of the minor child, we refer to the child by his initials and to appellant and the mother by their first names. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2011); TEX. R. APP. P. 9.8.

James engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being, and that termination of James's parental rights is in J.J.B.'s best interest. *See id.* § 161.001(1)(D)–(E), (2).

When an appellant challenges the legal and factual sufficiency of the evidence to support findings made under a clear and convincing evidence standard, we review all of the evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). In a legal sufficiency review, we examine the record in the light most favorable to the findings, assuming any disputed facts were resolved in favor of the findings if a reasonable factfinder could do so and disregarding any evidence the factfinder reasonably could have disbelieved. *See J.F.C.*, 96 S.W.3d at 266. In a factual sufficiency review, we evaluate the disputed evidence to determine if it is "so significant" that a factfinder could not reasonably have formed a firm belief of or conviction on the challenged finding. *Id.* We may conclude the evidence is factually insufficient only if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *Id.* In our sufficiency review, we remain mindful that the factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and we may not substitute the trial court's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

### ENDANGERMENT

James first contends the evidence is legally and factually insufficient to support the trial court's finding that he knowingly placed J.J.B. in conditions or surroundings that endangered J.J.B.'s physical or emotional well-being.

J.J.B.'s mother, Erica, testified about a history of domestic violence. She stated that James had previously used cocaine and would get violent when he came off his high. She testified about two occasions when James had "beat on her" in J.J.B.'s presence. The first time, J.J.B. was about one and a half years old. The second time was in 2012, when J.J.B. was three. Erica testified she and J.J.B. had been staying with her relatives because she was afraid of James, but that James found them. James took the child and dragged Erica from the house to a waiting car. Erica testified James handed J.J.B. to the driver, who held the child while he drove away. James held Erica and repeatedly punched her and hit her in the head with his fist. He later returned Erica to her relatives and the police were called. James was arrested and charged with domestic violence as a result of this incident. This incident was also the basis for a finding of neglectful supervision made by the Department of Family and Protective Services. The Department attempted to provide services and implement a safety plan, but ultimately removed the child and filed this suit.

J.J.B. was placed with one of Erica's cousins during part of the time this case was pending in the trial court. The cousin testified J.J.B. talked about James's assaults of Erica, both at home and at day care. Once when the child saw violence on a video game, he said, "Oh, my dad hit my mom. He punched her in the mouth and she started bleeding with a lot of blood." When asked what his mother had done, the child said, "Nothing. He just hit her because he was mad."

James Poindexter, the CPS legal worker assigned to this case, testified that J.J.B. freely talked to him about seeing his father beat his mother. He testified J.J.B. was very animated as he described the violence and it clearly had an impact on the child. Poindexter testified the three-year-old child did not have to search for words to describe the assault, making it appear that violence was commonplace for him. James's therapist testified generally that observing violence can have a very negative effect on a child, making him feel unsafe and insecure.

James argues there is no evidence to support the ground for termination because no evidence was presented that the child was ever struck or injured. We do not agree. "'[E]ndanger' means to expose to loss or injury or to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* Violence in a home is part of the "conditions or surroundings" of a child living in that home. *In re C.L.C.*, 119 S.W.3d 382, 392-93 (Tex. App.—Tyler 2003, no pet.). Abusive or violent conduct by a parent or other resident of a child's home can constitute a condition that endangers the child's physical or emotional well-being within the meaning of section 161.001(1)(D). *In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied).

The evidence of James's violence toward Erica was undisputed. Also undisputed is that J.J.B. witnessed the violence and has been affected by it. We hold the evidence was sufficient for a reasonable trier of fact to have formed a firm belief or conviction that James knowingly placed or knowingly allowed J.J.B. to remain in conditions or surroundings that endangered his physical or emotional well-being. Only one statutory ground must be proven to support a termination order. Accordingly, we do not address whether the evidence also supports the trial court's finding under section 161.001(1)(E).

**BEST INTEREST**

In deciding whether termination of a parent's rights is in the child's best interest, the factfinder looks at the entire record and considers all relevant circumstances. *See In re C.H.*, 89 S.W.3d at 27–29. In *Holley v. Adams*, the Texas Supreme Court enumerated considerations that may assist the factfinder in making that determination: the desires of the child; the emotional and

physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is a proper one; and any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 372 (Tex. 1976). However, the list is not exhaustive and not every factor must be proved to find that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. The absence of evidence about some of the *Holley* considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child. *Id.*

James contends the Department failed to meet its burden to prove termination of his rights is in the child's best interest because there was undisputed evidence that he worked hard to complete his service plan; had regular, productive visits with J.J.B.; had bonded with J.J.B.; never had a positive drug test; and attended most of his therapy sessions. In addition, James points out there was no evidence presented on some of the *Holley* factors.

Poindexter testified that after James was released from jail in March 2013, he began to work toward completing his service plan. James regularly attended visits with the child twice a month, and Poindexter testified James and J.J.B. interacted well and appeared to have bonded. Poindexter testified James initially made significant progress. By the fall of 2013, he appeared to have obtained housing and employment. However, in November 2013, James was again arrested for assault. Although James was released from jail in December, he had no contact with the Department from January 2014 until two weeks before the April 2014 trial. Poindexter testified that at the time of trial, James was living in a motel and did not have stable employment.

Poindexter testified that James refused to address the issues that led to the Department becoming involved in the case—his anger and violence. Poindexter testified that throughout the case James steadfastly denied all allegations of domestic violence, even though it had been witnessed by others, including the child. James refused to participate in domestic violence or anger management classes. Poindexter testified that by refusing to acknowledge his behavior harmed his child, James was unable to make the commitment necessary to ensure his son would not be exposed to domestic violence again.

Licensed clinical social worker Sheila Fitzpatrick counseled James during the case. She testified a plan was developed at the beginning of the case to address the primary issues of James's anger and rage, conflict with the child's mother, self-esteem issues, and unstable employment history. James attended eight of the eleven scheduled sessions.

Fitzpatrick testified that James did not meet his treatment objectives. During the time she counseled James, he was unable to obtain and keep a stable job or housing. More importantly, he refused to acknowledge any anger issues and denied feeling any rage. He became irritated when she tried to get him to talk about his feelings. He recognized his relationship with Erica was "toxic," but denied ever laying a hand on her and placed the blame on her for any problems that arose when they were together.[2]

Fitzpatrick testified James stopped attending sessions in November 2013, when he was arrested for assault for the third time. He called several times to reschedule, but did not appear at the appointments. Fitzpatrick testified that James appeared to be trying hard to successfully complete counseling. However, she does not believe he made much progress because he had yet to acknowledge the depth of his rage and anger issues. She does not believe James accepted that

---

[2] Although both Erica and James were counselled to stay away from each other, Erica testified they had been living together in a motel for the three weeks prior to trial.

he needed to change if he wanted to be reunified with his child. Fitzpatrick concluded that James did not successfully complete counseling. She testified she does not believe James could be a good parent at this time and recommended his parental rights be terminated.

Erika testified that James continues to threaten to hurt or kill her. She testified the reason she stopped visiting J.B.B. during the legal proceedings was because James told her that if she got custody of J.B.B., he would kill her. Finally, she testified that James had come to court the morning of trial, but soon left. When she spoke to James during a break, he told her he was not going to go back because he did not like what he had heard and he "would probably go off on—in court."

Poindexter testified the child is living with the same foster care family he has been with most of the time since he was removed from his parents. J.J.B. has started pre-kindergarten, loves school, and is doing well. According to Poindexter, J.J.B. is active, creative, and intelligent, and appears to be thriving. Poindexter testified the child appears to be on a good path, which would be derailed if James's rights were not terminated.

After reviewing all of the evidence, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination of James's parental rights is in J.J.B.'s best interest. We hold the evidence is both legally and factually sufficient to support the trial court's order of termination, and we affirm the order.

Luz Elena D. Chapa, Justice